**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA, and        CASE NO.: 8:13-cv-2724-JDW-MAP
the STATE of FLORIDA,
ex rel. MERIA BROADNAX,

              Plaintiffs/Relator,

v.

SAND LAKE CANCER CENTER, P.A.,
And VINICIO HERNANDEZ, M.D.

              Defendants.

_____/

**AMENDED COMPLAINT FOR DAMAGES AND**
**OTHER RELIEF UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730)**

On behalf of the United States of America and the state of Florida, Plaintiff and Relator, Meria Broadnax ("Ms. Broadnax" or "Relator") files this qui tam complaint against Defendants, Sand Lake Cancer Center, P.A. ("Sand Lake Cancer Center" or "Defendant"), and Vinicio Hernandez, M.D. ("Dr. Hernandez" or "Defendant") pursuant to 31 U.S.C. §3729, et seq., as amended and §§68.081-68.09 of the Florida Statutes to recover all damages, penalties, and other remedies available under the False Claims Act and Florida False Claims Act, and alleges as follows:

**Federal and State Law Claims**

1.    This is an action to recover treble damages and civil penalties on behalf of the United States of America and the state of Florida in connection with conduct that has compromised the provision of essential medical care and placed patients receiving cancer treatment in grave danger.

2. Defendants abused and mishandled powerful chemotherapy drugs and drugs related to chemotherapy treatment that placed hundreds, if not thousands, of cancer patients at risk of infection and possibly premature death.

3. Defendants systematically reduced the amount of drugs that a cancer patient received in order to generate additional profits and bonuses. Over time, the shorting of critical chemotherapy and related drugs has potentially precluded, or at the very least hindered, the ability of some cancer patients to fully recover and has potentially caused premature death in others. Defendants deceived the patients, the government, and insurance companies who were paying for the treatments.

4. Defendants utilized single-dose vials of medication as multi-dose vials and fraudulently billed government sponsored health care programs such as Medicare and Medicaid.

5. Defendants' scheme enriched themselves at the expense of patient care and severely impacted the health and well-being of cancer patients and their loved ones.

6. The Sand Lake Cancer Center, P.A. and Vinicio Hernandez, M.D. (hereinafter collectively "Defendants") demonstrated a total disregard for patient safety in order to maximize profits. Defendants forced employees to falsify patient information and to submit fraudulent billing to federal and state government sponsored health insurance programs.

7. Although patients believed that they were in the hands of capable health care providers, chemotherapy and related drugs were being routinely shorted to cancer patients and powerful chemotherapy drugs intended for only a single patient were being used on other patients.

8. Despite the unethical and fraudulent conduct, Defendants have not undertaken any action to notify patients who received cancer medication that was less than the prescribed

amount or told these patients that they may have received cancer medication that should have been wasted, and which may have caused infections or more serious consequences.

9. Instead of making the required refunds to the federal and state government for these false claims, Defendants have concealed the overpayments that resulted from the scheme and enjoyed the benefits of their fraudulent conduct.

10. Moreover, instead of making the necessary systemic changes to avoid such pervasive fraud and patient harm in the future, Defendants have continued to bill Medicare, Medicaid and other government agencies for cancer medications that were deliberately shorted and fraudulently billed as if they had received the entire amount.

11. Defendants have repeatedly and falsely certified that they are in compliance with the regulatory conditions of participation in Medicare, Medicaid and other government programs, when they knew they were not in compliance, thereby knowingly submitting additional false claims to Medicare, Medicaid and other government agencies. Even though they were made aware of these false claims, Defendants failed to return to the federal and state government payments that they were not entitled to receive.

12. On behalf of the United States and the state of Florida, Relator seeks to recover these damages as well as civil penalties arising from the false claims that Defendants caused to be submitted to the United States and the state of Florida, as well as money damages for the wrongful retention of overpayments and refunds that are due and payable to the United States.

**PARTIES**

**Relator**

13.     Under the False Claims Act, a person with knowledge of false and fraudulent claims against the Government (a "Relator") may bring an action on behalf of the federal government, state government and herself.

14.     Relator, Meria Broadnax is a resident of Orlando, Florida.   Relator was employed full time at the Sand Lake Cancer Center as a certified pharmacy technician beginning in June 2012.  At one time Relator was employed at the Sand Lake Cancer Center facility located at 7300 Sand Lake Commons Boulevard, Orlando, Florida.   During her employment, Relator was responsible for inventorying and mixing of all chemotherapy drugs and also performed clerical duties for the chemotherapy nurse manager.

15.     In 1995, Relator obtained her national certification from the Pharmacy Technician Certification Board to be a certified pharmacy technician.

16.     As a certified pharmacy technician, Relator is very experienced in the preparation and administration of cancer medications.  The preparation and administration of intravenous (IV) drugs is a relatively common procedure in many areas of clinical practice.

17.     Intravenous drugs come in a variety of forms, the most common being single-dose, glass, rubber-capped vials.  These vials may hold the drug in liquid form or in a powder or lyophilized form[1].  These drugs require an additional preparation step called reconstitution prior to administration.  The reconstitution process requires two vials and one disposable syringe. One vial contains the lyophilized drug and the other contains the diluent (often sterile water, but occasionally another liquid).

---

[1] Lyophilization is a process of freeze-drying a liquid drug and turning it into a powder form.

18.     The healthcare worker must use the syringe to insert air into the vial containing the diluent, withdraw the diluent into the syringe, insert the diluent into the vial containing the lyophilized drug, mix the solution to create an injectable medication, and draw a measured dose back into the syringe for injection.

19.     All allegations in this Complaint are based on evidence acquired by Relator independently, and through her own labor and efforts.  The information and evidence she has obtained, or of which she has personal knowledge, and on which these allegations regarding violations of the False Claims Act are based, consist of her personal involvement in working as the pharmacy technician for Defendants.

20.     None of the allegations set forth in this Complaint are based on a publicly disclosed information in a criminal, civil, or administrative hearing, in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media.  Rather, they are the independent declaration of the Relator.

21.     Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B) and Florida False Medicaid Claims Act, § 68.081-.09 Fla. Stat.

**Defendants**

22.     Defendants are Sand Lake Cancer Center, P.A. and Vinicio Hernandez, M.D.

23.      Sand Lake Cancer Center is a professional association organized under Florida law.  It began operations on October 17, 2005.  Sand Lake Cancer Center, P.A. is a full service oncology healthcare provider and has five locations in Central Florida.  Their locations are as follows:

1. **Sand Lake Commons Office**
   7300 Sand Lake Commons
   Suite 200
   Orlando, Florida 32819

2. **Dr. Phillips Hospital Office**
   7301 Stonerock Circle
   Suite 2
   Orlando, Florida 32819

3. **St. Cloud Office**
   3002 17th Street
   St. Cloud, Florida 34769

4. **Poinciana Office**
   339 Cypress Parkway
   Suite 110
   Kissimmee, Florida 34758

5. **Kissimmee Office**
   818 W. Oak Street
   Kissimmee, Florida 34741

24.     Sand Lake Cancer Center provides a wide scope of oncology services including diagnostics, chemotherapy, radiation therapy, hormonal therapy, targeted therapy, stem cell therapy, hematological, and complementary and alternative treatments.

25.     Dr. Hernandez is a Florida licensed physician who specializes in hematology and is Board Certified by the American Board of Internal Medicine in Medical Oncology and Hematology.  Dr. Hernandez's Florida Board of Medicine license number is ME73340.

26.     Dr. Hernandez is the founder and current owner of Sand Lake Cancer Center, as well as its Registered Agent and Director.  Dr. Hernandez is also the Officer/Director and the Registered Agent for Vinicio Hernandez, MD, P.A., which is located at 7300 Sand Lake Commons Blvd., Suite 200, Orlando, Florida 32819.  Dr. Hernandez is also on staff at Orlando Regional Medical Center.

27.     Registered Nurse Valerie Bastani had been employed by Defendants for several years prior to the commencement of Relator's employment at Sand Lake Cancer Center.  RN Bastani's conduct and fraudulent acts have contributed to patient harm and the overbilling of federal and state government sponsored insurance programs.  RN Bastani is not a named Defendant.

**Jurisdiction and Venue**

28.     Jurisdiction is proper in this Court because Relator seeks remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345.

30.     Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

31.     This Court has personal jurisdiction over Defendants because, as described herein, they transact business in the Middle District of Florida and the acts complained of occurred in the Middle District of Florida.

32.     Venue is proper in the Middle District of Florida pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in the Middle District of Florida, and because the acts alleged herein to be in violation of 31 U.S.C. § 3729 occurred in the Middle District of Florida.

**The Nature of the Case**

33.     Relator's first day on the job at Sand Lake Cancer Center was on June 14, 2012.  By mid-morning on the first day, Relator was mixing several combinations of chemotherapy drugs.  The chemotherapy nurse manger, Registered Nurse (RN) Valerie Bastani, watched her mix the drugs and at some point told Relator that she was doing a good job.  During her

employment, Relator would on occasion pull the drug Procrit[2] from supply for use with patients. After withdrawing a syringe with the required dosage of Procrit from the vial, Relator attempted to throw the vial (which contained a small amount of Procrit referred to as residual or overfill) into the biohazard waste, the proper method for disposal of the waste. RN Bastani instructed Relator that the waste in the vials was to be saved and not thrown away. RN Bastani told Relator that Defendants did not throw any of the drugs away because they reuse the overfill on patients and that this practice saved Defendants a lot of money.

34.     During Relator's employment, Nurse Bastani was responsible for ordering drugs for each of Defendants' centers. Nurse Bastani would personally restock the machines with drugs; manipulate the inventory each Thursday and Friday at the St. Cloud center; and make chart entries at the Kissimmee, St. Cloud, and Poinciana centers and on occasion at the Sand Lake location.

35.     A short time after she began working at Sand Lake Cancer Center, Relator was told by financial manager Asha Jiwan that large bonuses are given out from the profits made by drugs that are saved and reused by Defendants. Relator learned that Sand Lake Cancer Center used and double-billed government sponsored health insurance programs and private insurance companies for the overfill and waste.

36.     Over the next several months, Relator uncovered numerous activities that placed patients in great harm and resulted in overbilling to federal insurance programs, including Medicare, Medicaid, and Tricare, as well as to government sponsored employee health care plans and private insurance companies.

---

[2] Procrit is used in treating anemia resulting from chronic kidney disease and the treatment of cancer.

37.     Relator determined that Defendants were harming patients through the systematic shorting of chemotherapy drugs, falsifying patient records and submitting fraudulent billing to government and private health insurance programs.  The fraudulent activity was being committed in the following ways:

A.  Cancer patients were being deliberately shorted medication administered to them by employees of Sand Lake Cancer Center.

B.  Defendants utilized single-use vials on more than one patient.

C.  Nurses and Relator were instructed to and forced to falsify records and charts that patients received their complete dosage.  Defendants instructed nurses to fabricate doses and the administration time of drugs.

D.  Patients and government sponsored insurance programs including Medicare and Medicaid, were billed for medications that patients did not receive.

E.  Patients and government sponsored insurance programs, including Medicare and Medicaid, were billed for medications that were purportedly wasted, but in reality were used on other patients.

**Patient Harm**

38.     Defendants utilized an inventory management system called "Nucleus."[3] Nucleus automates the tracking and dispensing of drugs and was used by Relator on a daily basis.

39.     When a patient is prescribed a specific medication, Relator would enter patient information into the Nucleus system.  There is a computer attached to the Nucleus system that tracks patient information and drugs that were put into the system and dispensed.

40.     In early October 2013, the Nucleus system was set up to interface with the billing function of Defendants' office.  Prior to this time, the Nucleus system could not interface

---

[3] Nucleus Solutions is a technology platform for clinical and practice effectiveness associated with the delivery of care in the oncology community and a product of AmerisourceBergen.  The system is also referred to as a dispensing cabinet.

with billing. This lack of connectivity allowed for easy manipulation of the system. After the interface with billing, however, Relator was instructed to manipulate the Nucleus system's inventory to hide Defendants' false billing practices.

41.     Relator was instructed to manipulate the Nucleus system at the direction of Defendants and RN Bastani.

42.     Nearly all patients receiving treatment at Defendants' facilities received less than the prescribed dosage of cancer medication delivered by IV infusion for the entire time Relator was employed by Defendants.

43.     Defendants would deliberately short the patients the required and prescribed dosages of medication.

44.     The amount of drugs that a patient receives is based on a patient's height, weight, age and gender. A formula is used to determine the proper dosage called the body surface area (BSA). The patient information and the BSA are calculated to determine the appropriate amount of drugs.

**Patient Examples**[4]

   **Patient 1**

45.     Patient 1, a patient whose medical treatment by Defendants was covered by Medicare, is an example of how the fraud is being perpetrated by Defendants. Patient 1 was being treated for cancer by Defendants. As part of Patient 1's treatment plan, in or about June 2012, Patient 1was to receive 39 mg of Navelbine.[5] Relator was told by Dr. Hernandez and RN

---

[4] The names of the actual patients set forth herein have been omitted and assigned a number to protect their privacy. If necessary, a complaint with the names of each patient can be filed under seal, or these names will be revealed to the Court upon request or to Defendants upon the entry of an appropriate protective order.
[5] Navelbine is an anti-mitotic chemotherapy drug that is given as a treatment for some types of cancer, including breast cancer and non-small cell lung cancer.

Bastani to only provide Patient 1 with three 10 mg vials of Navelbine. Navelbine is available in 10 mg and 50 mg single dose vials. This resulted in Patient 1 being shorted 9 mg of medication.

46.     Relator was required and instructed by RN Bastani to manipulate the Nucleus system for Patient 1 to show that she withdrew four vials when in fact she only withdrew three vials. Relator requested that she be permitted to withdraw another 10 mg vial out of the Nucleus system to ensure that Patient 1 would receive the correct dose. RN Bastani informed Relator that she was not permitted to withdraw another vial and to use only the three vials that had been pulled for Patient 1. Nonetheless, Defendants billed the additional fourth vial to Medicare despite it not actually being administered to Patient 1.

47.     Defendants could have purchased four 10 mg vials which would have resulted in minimal waste and would have followed the guidelines established by the Centers for Disease Control. The Centers for Disease Control and Prevention guidelines state that clinicians and purchasing personnel should select the smallest vial necessary for their needs when making treatment and purchasing decisions. This is to prevent the unnecessary waste or temptation to use contents from single-dose or single-use vials for more than one patient.

48.     Defendants should have used four 10 mg vials to treat Patient 1. If this had occurred, the waste would have been 1 mg. Medicare rules state that any excess medication—often referred to as justified waste—from a single-dose or single-use vial can be charged to the patient and billed to government sponsored health programs.[6]

49.     When Relator questioned why only certain size vials of medication were being ordered, she was told by RN Bastani that Bastani was in charge of ordering the medications.

---

[6] See http://www.cdc.gov/infectionsafety/cdcposition-singleusevial.html

Relator would prepare patient medications based only on what RN Bastani ordered for each patient. Relator soon learned that Defendants intentionally short-ordered cancer medication to maximize profits.

50.     With regard to Patient 1, Relator was told by RN Bastani to get the total dose needed for a patient from the vials that RN Bastani purchased for the patient. The Nucleus system would provide Relator with information related to the availability of a drug. If there was not enough Navelbine to cover the order, the following information box would appear on the computer screen:



51.     This practice occurred every day for all patients who received treatment at the center where Relator worked. In order to insure that the Nucleus system was accurate, Relator was instructed to manually manipulate or fool the system. In the above example, Relator would take three 10 mg vials from the Nucleus system and then change the inventory to reflect that

four 10 mg vials were removed. Patient 1 was a patient of Defendants prior to the time Relator began working at Sand Lake Cancer Center. During Relator's employment, Patient 1 was prescribed 39 mg of Navelbine, which was to be administered every 21 days and which was then billed to Medicare. Each time Patient 1 was scheduled to come in for treatment of Patient 1's cancer, RN Bastani would only order three 10 mg single-dose vials for the patient's treatment. During each visit, Patient 1 was shorted 9 mg of Navelbine although Defendants billed the government as if four 10 mg vials of Navelbine were used. Over a six month period of time, Patient 1 received approximately eight treatments, which resulted in Defendants shorting the patient 72 mg of Navelbine or the equivalent to almost two doses. Nearly all patients' medications are short ordered, yet in order to increase their profits, Defendants falsely bill Medicare for the full amount of medication. For example, the photo below shows the three 10 mg vials that Relator pulled from the Nucleus system for Patient 1 on or about October 15, 2013, yet the label states that the patient will receive 39 mg of Navelbine.



52. Likewise, in the below photo the actual syringe that was drawn up for Patient 1 on or about October 15, 2013, and which was subsequently administered to Patient 1, only contained 30 mg, yet the government was billed as if Patient 1 had received 39 mg of Navelbine.



53. RN Mary Schlegel administered the medication to Patient 1. Relator and RN Schlegel were forced by Defendants' policy to short the medication given to the patient and then fabricate patient records so that they matched with the prescribed dosage.

54. Relator was not the only one of Defendants' employees who was forced to manipulate the Nucleus machine to cover up Defendants' fraudulent billing practices. Relator witnessed Nurse Bastani, technicians, and other nurses routinely manipulate the Nucleus machine. One day, Dr. Hernandez personally instructed Relator to manipulate the Nucleus machine on a Taxotere patient and short the medication. Relator also examined the history reports of the Nucleus machine and observed that Relator's predecessor had a pattern of manipulating the Nucleus machine to dispense inaccurate doses.

55.     Nor were Defendants' improper policies relegated solely to implementation by Nurse Bastani and Dr. Hernandez. Rather, these policies were uniformly enforced by various staff members. For example, on another occasion, Asha Jiwan, Defendants' Assistant Practice Manager, instructed Relator and two other employees of Defendants, Nurses Lee and Tainese, to manipulate the Nucleus machine to charge for 1100 mg of Infed for a 1000 mg dosage.

56.     For a patient to receive the chemotherapy drug Procrit, Relator was required to save the residual or overfill that was left in each single-use vial. Relator was instructed by RN Bastani and former chemotherapy nurse manger RN Dayls Montes (Montes left the practice in April 2013) that the only way a patient could receive the drug was by taking the residual or overfill from multiple vials to make one patient dose.

57.     Procrit was only ordered by RN Bastani in units of 40,000 (40,000 units equals 1cc). Each vial of Procrit has a small amount of residual (or overfill) that Relator was required to save and to reuse for other patients. The photo below is an example of the used single-dose vials of Procrit and Neupogen that were saved by Defendants, billed a second time to the government, and administered to other patients:



58.     Relator frequently questioned RN Bastani and Montes about this practice.  At one point, Relator felt threatened that Defendants were going to terminate her for bringing this matter up so often.  One of the RN's actually told Relator that "this is the way we do things here, if you [Relator] don't like it, you have to move on."

59.     Another one of Defendants' employees, Valerie Redman, also confronted Nurse Bastani regarding these same unlawful practices.  One morning Relator came to the center to begin her shift and witnessed Nurse Bastani yelling at Ms. Redman.  Ms. Redman drew Relator into the confrontation by asking Relator if Defendants' practices were lawful. Nurse Bastani attempted without success to convince Relator and Ms. Redman that the practice of shorting medications was lawful.  Nonetheless, Nurse Bastani made no attempt to justify the fraudulent practice of double billing the government for the waste.

60.     Relator was extremely concerned about Defendants using the waste from multiple single-use vials on patients.  The use of single-dose vials of medication on more than one patient can significantly compromise a patient's health.  Single-dose vials or single-use vials typically lack antimicrobial preservatives and can become contaminated and serve as a source of infection.  An infectious disease outbreak involving single-dose or single-use vials that were used on multiple patients could cause extensive harm to already immune compromised patients and increase health care expenses to the patient and government sponsored insurance programs.

61.     Defendants' practice was to round down the dosage on all patients.  Relator initially requested specific syringes that could be used to administer chemotherapy medication and was told by RN Bastani that Defendants only ordered specific sized syringes and that they would round down the dosage for each patient.

62.     Relator needed syringes in varying sizes in order to draw up the appropriate doses of medication for each patient.  RN Bastani only ordered 3cc, 10cc, 20cc and 60cc syringes.  Relator was told that she did not need other size syringes since they round down all doses.

63.     Relator became concerned about the safety of patients that were being treated by Defendants.  Relator had never experienced nor witnessed such a blatant disregard for patient safety.  Relator was instructed by Defendants to short the chemotherapy medication for patients and to then falsify the records to reflect that full dosages had been administered.  Relator and the patient's nurse would confirm that the patient was receiving the correct dosage when in fact they knew that was false.  Thus, while a facial review of the medical records would appear correct, in actuality patients were not receiving the correct doses nor was the government paying for the true amount of medication used.

**Patient 2**

64.     Relator become frustrated and upset about this practice during her employment.  Relator did not usually get to know the patients but on one occasion Relator was passing through the clinic and a patient wanted to meet her.  Patient 2, who was 66 years old and on Medicare, commented to Relator that recently she had not been having the severe side effects that often accompany receiving cancer medication.  Patient 2 attributed this to the skill that Relator had in preparing her medications.

65.     Relator and Patient 2 began to see each other more frequently during Patients 2's visits to Sand Lake Cancer Center.  Patient 2 had been receiving treatment prior to the commencement of Relator's employment at Sand Lake Cancer Center.  Relator knew that Patient 2 was being shorted her chemotherapy medication for many years while Patient 2 was

treated by Defendants, and as Relator became more familiar with Patient 2, Relator became upset at the manner in which Patient 2 was treated.

66. On September 5, 2013, Patient 2 had a heart attack and passed away a few weeks later. Relator does not know if the shorting of cancer medication contributed to her death, but Relator decided to report the Defendants' activity to the appropriate officials. The day before Patient 2 passed away, Relator sent a an email message to the Aetna Insurance Special Investigations Desk regarding Defendants' practice of shorting medications administered to patients, and she received a response to her email. The email exchange is captured below:



| Secured Message | | |
|---|---|---|

| From: | Special Investigations Desk <aetnasiu@aetna.com> |
|---|---|
| To: | Meria Sheppard <m.broadnax@cfl.rr.com> |
| Date: | September 19, 2013 7:25:06 AM EDT |
| Subject: | RE: Healthcare Fraud |

Good morning,

Thank you for contacting Aetna Special Investigations.

We take all referrals to Aetna SIU seriously.

Can you please provide us with additional information/details such as:

Provider's name(s), address,

member name(s), address and/or member identification numbers,

as well as any/all specific information detailing the nature of the fraud you have witnessed.

Once this information is provided we will follow up on this matter.

Sincerely,

JM
Special Investigations Desk

**From:** Meria Sheppard [mailto:m.broadnax@cfl.rr.com]
**Sent:** Wednesday, September 18, 2013 8:52 PM
**To:** Special Investigations Desk
**Subject:** Healthcare Fraud

To Whom It May Concern:

 Please be advised, as a healthcare worker, I have witnessed healthcare fraud, deceptive
billing prices, theft of patients' medications, neglect of patients and illegal practices by
healthcare workers. These practices have taken place from 2007 to 2013. It is my belief
that some of these practices have also caused premature death to the patients. It is my
sincere hope that working together we can help those that are being harmed, as well as,
put a stop to these practices harming anyone else in the further. If you would like to
speak with me further, I can be reached by e-mail or by calling me at (407) 288-7253

Best Regards, 0Meria S. Broadnax

67.     Relator knew that Patient 2 and her family believed that Patient 2 received the best care possible from Defendants, when in fact, Patient 2 did not.  Relator was appalled to know that the family of Patient 2 wrote in the obituary that in lieu of flowers, memorial donations could be sent to Sand Lake Cancer Center, Orlando.

**Falsifying Patient Records**

68.     In order to cover up the fraudulent activity that was occurring regularly, and to insure that investigators who might inspect the books and records of Defendants' businesses would not stumble upon their fraudulent activity, Defendants required Relator and nurses to falsify records.

69.     In addition to manipulating the Nucleus system, Relator and nurses had to verify each dosage prior to delivery to the patient.

**Patient 3**

70.     Patient 3, another Medicare patient, was prescribed to receive a 110 mg dose of Irinotecan[7] on October 9, 2013.

71.     Relator, as part of her job duties as directed by Defendants, conducted an inventory of all drugs within the Nucleus system each day.  RN Bastani did the ordering for patients who would be receiving treatment for the next seven days (Wednesday through Tuesday).  RN Bastani would only order one 100 mg single-dose vial for Patient 3 even though his prescribed dosage was for 110 mg.  As part of the scheme and in order to bill the government for more than the dosage of medication being administered to patients, Relator would withdraw only one 100 mg vial from the Nucleus system and manipulate the machine so that the label that was printed would show the correct, 110 mg, dosage.

72.     RN Bastani created a daily calendar sheet that identified each patient who would receive cancer medication during that particular day.  After a patient's medication was provided to the patient, the nurse of that patient would put her initials next to the dosage provided.

73.     Even though Patient 3 only received 100 mg of the medication, Defendants billed Medicare for 140 mg (a 100 mg vial and a 40 mg vial) as if 110 mg had been administered, leaving 30 mg of waste.  As a result of this conduct, the patient's medication was shorted by 9% for each visit yet billed as if the patient had received the full prescribed dosages. A photo of the fraudulent label is set forth below:

---

[7] Irinotecan is a cancer medication often used to treat colon cancer and is sold by Camptosar.  It is abbreviated as CPT.



In this photo, the label depicted was placed on the IV bag
containing Irinotecan. Patient 3 was to receive 110 mg dose of
Irinotecan, while in fact Patient 3 received only 100 mg of Irinotecan.

74.     RN Bastani devised a system whereby she created a daily block sheet for each

day that contained the names of patients that were to receive medication.  The block sheet was

taped up on the Nucleus system.

75.     RN Bastani would meet with Dr. Hernandez at the beginning of the day and go

over the patients who would be coming in and the medications that they were to receive.  After

Relator prepared the medication and the label was printed and placed on the IV bag, the nurse

and Relator would confirm the dosage and the patient would receive the medication.  The nurse

would then initial next to the drug that the patient received.

76.     In the case of Patient 3, the first block on the photo below reveals that "CPT 110

mg" was administered in the left arm or chest port (looping letter L) and that VR gave the IV

infusion.  VR stands for RN Valarie Redman.  In order to administer 110 mg of Irinotecan, a

100 mg dose and a 40 mg dose would have had to been used to administer 110 mg total.

However, Relator observed that Patient 3 did not receive 110 mg, he only received 100 mg.  At

a later date, Relator inquired of Defendants' billing employee and confirmed that Medicare was billed as if 110 mg of Irinotecan had been administered. In order to cover up the fraudulent billing of the additional 10 mg, Valerie Redman created an entry in the patient's records to reflect that she had administered 110 mg of Irinotecan and wasted 30 mg.



**Fraudulent Billing**

77.     Defendants deliberately shorted cancer medication to patients and used single-use vials on multiple patients in an effort to increase profits and bonuses. The fraudulent billing

occurred when patients were shorted medication yet billed like they had received the full amount. Defendants utilized single-use vials on multiple patients which allowed them to bill for waste even when there was no waste created. When waste was created, Defendants would use the wasted amount as a new dose to patients and re-bill the government.

78.     Medicare Patient 1 required 39 mg dosage while the actual dosage administered was 30 mg, but the government was fraudulently billed for dosages not received by Patient 1.

79.     Medicare Patient 3 required 110 mg dosage while the actual dosage administered was 100 mg, but the government was fraudulently billed for dosage not received by Patient 3.

80.      Patient 4 (Medicare patient) and Patient 5 (Medicaid patient) were to receive 1000 mg of Infed.[8]  As was the practice for patients receiving Infed, a 25 mg sample was often given to the patients as a test dosage.  RN Bastani required that the test be done every time on a patient who was to receive Infed.  This is a common practice to insure that the patient does not have a reaction to a particular drug.

81.     On each occasion when a test dosage was administered to patients, as with Patients 4 and 5, RN Bastani forced Relator to manipulate the Nucleus system to show that ten vials containing a total of 1000 mg's of Infed, plus one additional 100 mg vial were pulled from the Nucleus system, when in reality the extra 100 mg vial was not pulled out and the 25 mg test was withdrawn from the 1000 mg vials that were pulled.  Defendants would fraudulently bill the government for the additional 100 mg vial of Infed even though no additional 100 mg vials were used for the patients.  Thus, as the below photo shows, on or about October 15, 2013, ten, 100 mg bottles of Infed were pulled for Patient 4 and the 25 mg test was drawn from one of the

---

[8] Infed is Iron Dextran and is used to treat iron deficiency anemia that can result from taking cancer medications.

100 mg bottles.  The syringe with the 25 mg test dosage can be seen in the photo, as well as the opened vial of Infed from which it was withdrawn for Patient 4.



82.     Patient 5 was treated identically, on or about September 24, 2013: *i.e.* Patient 5 was to receive a 1000 mg dose of Infed with a 25 mg test dosage, but the 25 mg test dosage was improperly taken from the 1000 mg total.

83.     The government was billed for the entire amounts prescribed for Patients 1, 3, 4 and 5 when in actuality the prescribed dosages were not used for those patients.

84.     The specific patient examples alleged herein are simply illustrative examples of the broader scheme perpetrated by Defendants.  Relator intends to seek discovery and recovery on behalf of the government related to Defendants' entire scheme.

85.     Defendants' greed, criminal acts and manipulation of the health care system should extinguish their ability to participate in government sponsored health care insurance programs in the future.

**The False Claims Act**

86.     The False Claims Act (FCA), as amended, provides in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

87. The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

88. The Florida FCA, as amended, provides in pertinent part that:

Any person who (a) Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; (b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; (c) Conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid; …(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency, is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person. §68.082 Fla. Stat. (2011)

89. The terms "knowing" and "knowingly" in the Florida FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is

required. Innocent mistake is not a defense to an action under this act." § 68.082 Fla. Stat. (2011)

**CLAIMS PROCESSING PROCEDURE UNDER MEDICARE**

90.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  See 42 U.S.C. §§ 426, 426-1.

91.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

92.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund.   42 U.S.C. § 1395(u).   In this capacity, the fiscal intermediaries act on behalf of CMS.   42 C.F.R. § 413.64.   Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

93.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions

or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve Part B for services billed by the Defendants to Medicare.

94.    When providing chemotherapy as a service under Part B Medicare, physicians purchase the drugs, manage inventory, administer drugs in-office, and submit claims to Medicare and Medigap insurers for reimbursement of the drug and certain associated administrative costs, such as copay collections.

95.    In order to get paid from Medicare, providers (like Defendants herein) complete and submit a claim for payment on a designated Health Insurance Claim Form, which during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

96.    To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## CONDITIONS OF PARTICIPATION AND CONDITIONS OF PAYMENT

97.    To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement

requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

**Medical Necessity and Appropriateness Requirements**

98. One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

99. Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records. *Id*.; *see also*, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

100. The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization." The intentional shorting of critical medication, as well as the billing for waste which is subsequently reused and billed again, falls outside of medical necessity.

**Obligation to Refund Overpayments**

101. As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports). 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C; *see also* 42 C.F.R.

§§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

102. Accordingly, if CMS pays a claim for medical goods or services that was not medically necessary, a refund is due and a debt is created in favor of CMS. 42 U.S.C. § 1395u(*l*)(3). In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395*l*(j).

**OTHER FEDERALLY-FUNDED HEALTH CARE PROGRAMS**

103. Although false claims to Medicare are the primary FCA violations at issue in this case, some of the patients who were subjected to the medication shorting and overbilling that are the subject of this action were also beneficiaries of one of three other federally-funded health care benefit programs – Medicaid, TRICARE/CHAMPUS and the Federal Employee Health Benefits Plan.

**MEDICAID**

104. The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level, and reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim

forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

105.    Each state, including Florida, within broad national guidelines established by federal statutes, regulations and policies; (1) establishes its own eligibility standards; (2) determines the type, amount, duration and scope of services; (3) sets the payment for services; and (4) administers its own program.  States have broad discretion in determining which groups their Medicaid programs will cover and the financial criteria for Medicaid eligibility. In order to be eligible for federal funds, however, a state must provide Medicaid coverage to certain individuals who receive federally assisted income-maintenance payments.  The federal portion of a state's Medicaid payments-known as the Federal Medical Assistance Percentage (FMAP), is calculated by comparing the state's per capita income to the national average.

**TRICARE, formerly known as CHAMPUS**

106.    A federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.  Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq*.).

107.    Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).  Like the Medicare Program and the Medicaid Program, TRICARE prohibits

practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

**FEDERAL EMPLOYEE HEALTH BENEFIT PLAN**

108. The Federal Employee Health Benefit Program (FEHBP) is a government administered health care insurance program for employees of the federal government. It contains numerous coverage options similar to private health insurance.

109. False claims submitted to the agents or third party contractors of the FEHBP are subject to the False Claims Act.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A))

110. Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

111. As more particularly set forth above, by virtue of the acts alleged herein Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

112. The United States, or its authorized agent, paid the false and/or fraudulent claims.

113. Had the United States known of the overbilling and under dosing scheme by Defendants, it would have refused to authorize payment for services provided by Defendants.

114. By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the United States has suffered substantial monetary damages.

## SECOND CAUSE OF ACTION
(False Claims Act: Making or Using False
Record Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(1)(B))

115.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

116.    As particularly set forth above, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made or caused to be made by Defendants and were material to the government's payment determination – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

## THIRD CAUSE OF ACTION
(False Claims Act: Making or Using False
Record Statement to Avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(1)(G))

117.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

118.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made or caused to be made by Defendants and were material to the government's payment determination – material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

## FOURTH CAUSE OF ACTION
### Florida False Claims Act § 68.082(a) Fla. Stat.
### Presentation of False Claims

119.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

120.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants knowingly caused the submission of false or fraudulent claims to the Medicare and Medicaid programs.

121.    Defendants have knowingly presented or caused to be presented false or fraudulent claims to Florida healthcare programs for payment or approval in violation of §68.082(a) Fla. Stat.

122.    The state of Florida, or its authorized agent, paid the false and/or fraudulent claims.

123.    Had the state of Florida known of the overbilling and under dosing scheme by Defendants, it would have refused to authorize payment for services provided by Defendants.

124.    By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the state of Florida has suffered substantial monetary damages.

125.    As more particularly set forth above, by virtue of the acts alleged herein Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of §68.082 (2)(a) Fla. Stat.

## FIFTH CAUSE OF ACTION
### Florida False Claims Act § 68.082 (2)(b)
### Making or Using False Record Statement to Cause Claim to be Paid

126.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

127.    As more particularly set forth above, by virtue of the acts alleged herein Defendants knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the state of Florida, or (b) material to false or fraudulent claims, in violation of §68.082 (2)(b) Fla. Stat.

128.    By engaging in the above conduct, Defendants knowingly caused the submission of false or fraudulent claims for payment to the United States and the state of Florida, and knowingly caused the use of or reliance upon false statements, resulting in the payment of false or fraudulent claims. 31 U.S.C. §3729(a)(1) and (2).

129.    Had the state of Florida known about the false records certifying compliance with state and federal laws, they would not have paid the claims of Defendants.

130.    By virtue of the false records or statements Defendants made or caused to be made, the state of Florida has suffered substantial monetary damages.

131.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of §68.082 (2)(b) Fla. Stat.

**SIXTH CAUSE OF ACTION**
**Florida False Claims Act § 68.082 (2)(g)**
**Making or Using False Record Statement to Avoid an Obligation to Refund**

132.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

133.    As particularly set forth above, by virtue of the acts alleged herein, Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay to the government.

**DEMANDS FOR RELIEF**

WHEREFORE, Relator, on behalf of the United States of America and the state of Florida, demands judgment against the Defendants, ordering that:

**As to the Federal Claims:**

a.      Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the Claims on behalf of the state of Florida:**

a.      Pursuant to section 68.082, Defendants pay an amount equal to three times the amount of damages the state of Florida has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of § 68.085 et seq;

b.      Relator be awarded the maximum amount allowed pursuant to section 68.085 of Florida Statutes and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by section 68.085 and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

**TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

Dated this 22nd day of June, 2016.

Respectfully submitted,

*/s/ John A. Yanchunis*
John A. Yanchunis, Esquire
Florida Bar No. 324681
jyanchunis@forthepeople.com
James D. Young, Esquire
Florida Bar No.: 567507
jyoung@forthepeople.com
Patrick A. Barthle, Esquire
Florida Bar No.: 99286
pbarthle@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, Florida 33602
(813) 318-5169 Telephone
(813) 222-4793 Facsimile

George F. Indest, III, Esq.
Florida Bar No. 382426
gindest@thehealthlawfirm.com
**THE HEALTH LAW FIRM**
1101 Douglas Ave.
Altamonte Springs, FL 32714-2033
(407)331-6620 Telephone
(407)331-3030 Facsimile

*Attorneys for Relator*

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been served electronically via the CM/ECF system to all participants on June 22, 2016.

 */s/ John A. Yanchunis*
JOHN A. YANCHUNIS, ESQ.