William Parker

Expert Opinion

U.S. ex rel. Broadnax v. Sandlake Cancer Center

# TABLE OF CONTENTS

I.     QUALIFICATIONS AND ASSIGNMENT………………………………    2
     A.     Qualifications……………………………………………………...    2
     B.     Assignment……………………………………………………....    4
     C.     Documents and Information………………………………………    5
         1.     Materials Produced by Defendant………………………    5
         2.     Other Materials…………………………………………    5
         3.     Definitions………………………………………………    5

II.     BACKGROUND…………………………………………..…………    11
     A.     Fraud, Waste, and Abuse………………………………………    11
     B.     Single-Dose/Single-Use Vials…………………………………..    12

III.     MY OPINIONS REGARDING PRACTICES REFLECTED IN MATERIALS I REVIEWED……………………………………………………………    14
     A.     Methodology…………………………………………………....    16
     B.     Limitations on Expert Analysis…………………………………    17

     Analysis Number 1 Navelbine® (vinorelbine)…………………………    19
     Analysis Number 2 Avastin® (bevacizumab)…………………….…...    22
     Analysis Number 3 Cyclophosphamide……………………………...    26
     Analysis Number 4 Fluorouracil (5FU)………………………………    32

Appendix A……………………………………………………………………    45
Appendix B……………………………………………………………………    48

# I.    QUALIFICATIONS AND ASSIGNMENT

## A.    QUALIFICATIONS

I am William Byron Parker, Registered Pharmacist (RPh), duly licensed in the State of Florida by the Board of Pharmacy, currently active until renewal on 9/30/2019 (license number PS17652). In addition, I held a license by the State of Florida Board of Pharmacy as a Consultant Pharmacist (license number PU1908), from October 4, 1979 until December 31, 2012, at which time I voluntarily relinquished the license without cause. I hold a Bachelor of Science degree in Pharmacy from Auburn University (August, 1978) and a Master of Science degree in Pharmacy from the University of Florida (August, 2016) in the Pharmaceutical Outcomes and Policy. I am an alumni-teaching assistant at the University of Florida Department of Pharmacy Graduate School program, currently working with instructors in the Public Policy and the Federal Regulations of Drugs courses.

Relevant to my opinions in this matter, my professional experience spanning 40 years includes:

> a)     Direct supervision of high volume hospital infusion mixing centers (for instance; oncologics, antibiotics, total parenteral nutrition, and complex drug therapies) in four hospitals in Jacksonville (Baptist Medical Center, St. Vincent's Medical Center, Riverside Hospital, and Memorial Hospital). My responsibilities included: clinical evaluations of physician orders and accurate computer order entry, inventory purchasing and reconciliation, technician training and oversight, and final checks before

being released for patient injection and/or infusion. I have personally mixed an incalculable number of intravenous drug preparations, including oncology drugs, while maintaining aseptic[1] conditions required for the final product's safety and sterility. The standards of care and practices for aseptic IV mixing operations are focused on minimizing the patient's exposure to bacterial, fungal, and other contaminants and are based upon universally accepted guidelines recognized by the FDA and The United States Pharmacopeia (USP)[2],

b)      Managing specialty and high tech infusion pharmacies providing high-cost complex drug therapies for patient self-administration or physician office administration including preparation under aseptic conditions of patient IV medications.

c)      Investigation and reporting of physician provider claims for reimbursement outside of the provider contract and standards of claim submission.

d)      I was contracted by Florida Blue (formerly BlueCross BlueShield of Florida) for 18 months as the subject matter expert on Medical Benefit drug claims. I was responsible for initiating investigations for the Provider Audit and Special Investigations Units of suspected claims to identify and confirm provider overbilling for reversal of payment for cause per contractual obligations.

---

[1] (see Definitions: Aseptic Technique pg. 8)
[2] The United States Pharmacopeia is a nonprofit organization that establishes written and physical reference standards for medicines that are used by regulatory agencies to help to ensure that these products are of the appropriate identity, as well as strength, quality, purity and consistency.

e.)     Since 2012, I have worked as a self-employed consultant for SRx Analytics, LLC, advising clients on proper billing and coding of medications, intricacies of drug distribution, and responsibilities of providers in maintaining compliance with payer claim submission requirements.

I have previously consulted or served as an expert witness. The matters in which I have testified in the past two years are: *United States of America ex rel. Michael Irwin; State of California ex rel. Michael Irwin v. Walgreen Co., Case No. 2:13-cv-8473-BRO (ASx).*

A copy of my curriculum vitae, which more fully sets forth my qualifications and experience, is attached as Appendix A. I am being compensated for my work on this case at a rate of $200 per hour. This compensation is unrelated to the outcome of this matter.

## B.     ASSIGNMENT

I was retained by the law offices of Morgan & Morgan and Milberg Tadler Phillips Grossman LLP (the "Firms") to provide an expert opinion regarding the litigation captioned *Broadnax v. Sand Lake Cancer Center, P.A. et al*., Case No. 8:13-cv-2724-JDW-MAP (M.D. FL).   I was consulted to review certain documents and to provide objective opinions regarding how the practices reflected in these documents relate to allegations cited within the complaint.

A list of the materials upon which I relied to prepare this report is provided in Appendix B.

## C.     DOCUMENTS AND INFORMATION

The documents I received from counsel in this ligation and which I reviewed in preparing my opinions include:

### 1.     Materials Produced by Defendant:

- Nucleus Dispensing System data: *ABC-SAN-013681 (ABC 013675) w SDV-MDV.xlsx*
- First Coast Service Options (FCSO) paid Medicare claim data: *wr13808 output.xlsx*
- Electronic Medical Record (EMR) data: *SLCC001844_CONFIDENTIAL.xlsx*
- Supplier Purchase data: *ABC-SAN-000282 (ABC 000277) w SDV-MDV.xlsx*

### 2.     Other Materials

- Deposition transcripts of the following persons:
- Dr. Vincinio Hernandez (March 9, 2017)
- Meria Broadnax (December 9, 2017)
- Valerie Bastani (January 22, 2018)
- Asha Jiawan (January 23, 2018)
- Various additional publicly available reference documents and other reference materials, some of which are annotated throughout.
- The Amended Complaint filed in this matter, ECF No. 15

### 3.     Definitions

- **Fraud** – "Knowingly submitting, or causing to be submitted, false claims or making misrepresentations of fact to obtain a Federal health care payment for which no entitlement would otherwise exist." See: *Medicare Learning Network ICN 006827, September 2017*

- **Abuse** –"Abuse describes practices that, either directly or indirectly, result in unnecessary costs to the Medicare Program. Abuse includes any

practice inconsistent with providing patient with medically necessary services meeting professionally recognized standards." See: *Medicare Learning Network ICN 006827, September 2017 "*The primary difference between fraud and abuse is intention." See*: CMS 2016 National Training Program – Medicare and Medicaid Fraud and Abuse Prevention.*

- **Waste –** "When a physician, hospital or other provider or supplier must discard the remainder of a single use vial or other single use package after administering a dose/quantity of the drug or biological to a Medicare patient, the program provides payment for the amount of drug or biological discarded as well as the dose administered, up to the amount of the drug or biological as indicated on the vial or package label. The discarded drug amount is the amount of a single use vial or other single use package that remains after administering a dose/quantity of the drug to a Medicare beneficiary." See: *Medicare Claims Processing Manual, Chapter 17 – Drugs and Biologicals*

- **Single Use or Single Dose Vial** - "Vial, Single-Use" – "A vial where a single dose of a parenteral drug product can be removed, and then the vial and its remaining contents can be disposed" See: *Data Standards Manual Package Type.*

- **Multi Dose Vial** – "Vial, Multi-Dose" – "A vial intended to contain more than one dose of the drug product" See: *Data Standards Manual Package Type.* "A multi-dose vial is a vial of liquid medication intended for parenteral administration (injection or infusion) that contains more than

one dose of medication." Multi-dose vials are labeled as such under FDA guidelines by the manufacturer and typically contain an antimicrobial preservative to help prevent the growth of bacteria, effectively resterilizing the contents of the vial. "Medication vials should always be discarded whenever sterility is compromised or questionable." See: *CDC FAQs Regarding Safe Practices for Medical Injections*

- **HCPCS Level II Code –** The HCPCS Level II code sets are a standardized coding system to ensure that claims (e.g. drugs) are processed in an orderly and consistent manner across all providers and payers. Level II codes consist of a single alphabetical letter followed by 4 numeric digits. (e.g. J0885)  See *CMS.gov – HCPCS Level II Coding Process & Criteria*. The HCPCS "J" codes include the majority of drugs and biologicals that should be reported with infusions, injections, and supply codes. Each "J" code is assigned a specific unit of measurement (UOM) for billing purposes, which is distinct from the trade package used in interstate commerce. This conversion is necessary to comply with standards of healthcare claim processing and payment to providers.

- **Aseptic Technique –** "Aseptic technique refers to the use of standardized practices and procedures to prevent contamination of IV products from pathogens. It involves applying the strictest rules to minimize the risk of infection. Healthcare workers use aseptic technique in surgery rooms, clinics, outpatient care centers, and other health care settings."[3]

- **Nucleus® Dispensing System –** The Defendants utilized an in-office, password protected, electronic drug inventory management and dispensing cabinet (called the Nucleus®). The Nucleus® records each transaction whenever the Nucleus® is opened or accessed by computer terminal. This detailed information provides a valid and methodological audit tool based upon the availability of the perpetual inventory or drugs, as every action is date and time stamped. Certain Nucleus® "Action" terms and definitions are used throughout this opinion, as defined in the Nucleus® Reference Guide: See: *Nucleus® 3.0 Reference Guide*

- ***Dispense*** – "User can dispense the items from the station."

- ***Audit***\*– "Allows users the ability to open the cabinet doors and perform a physical count of the actual inventory without setting off 'failed door' alerts." The data reviewed indicates that "Audit" was often used to add inventory to the Nucleus®.

- ***Restock***\* – "User can restock inventory with either PO or restock."

- ***Position Management*** – "Change Min/Max, assign items to position, and anything else included in User ability to manage inventory at the position."

---

[3] https://www.healthline.com/health/aseptic-technique

- ***Return*** – "Allows a user to return an item to a single position for a specific patient."

- ***Waste*** – "Specific permissions provide that the inventory is kept secure during the waste procedure. The patient Waste permission authorizes a user to waste items. That is, a user would be granted the right to dispose of medication that has expired or the seal of which has been broken and, therefore, makes it ineligible to be returned to the cabinet."

- ***WasteAtDispense*** – "When an order is entered into the system, the system automatically recognizes single-use/single-dose vials. The system automatically calculates the dose and the waste based upon the single-use/single-dose vial and reports pertinent information in the inventory management record."

The data reviewed reflects that, at times, users of the Sand Lake Cancer Center's Nucleus® Dispensing System used ***Restock*** and ***Audit*** interchangeably when drugs were entered into the perpetual inventory. Lack of strict adherence to the correct action terms used by Sand Lake Cancer Center complicated data analysis at times. By relying on the purchase records from Oncology Supply (Sand Lake Cancer Center's wholesale drug supplier), I was able to clarify these entries during my analysis.

The Nucleus® perpetual inventory management system: (See – *OncologySupply.com*)

- "Automatically calculates wastage of single use vials, and the option to store multidose vials under the hood."
- "Automatically matches and configures the items on the med order to the items stocked in the Nucleus®"
- "Clinic Charge feature allows for removal of expired or unusable items which will not be charged to the patient, all while maintaining a paper trail." I was unable to find evidence of the use of this feature by Sand Lake Cancer Center.
- "Edit lists of physicians, waste, returns, and inventory discrepancy reasons."
- "View all Nucleus® data from any computer that can access a secure web page."
- "Dedicated Report Analyst can customize reports for your practice at no charge."

- **Perpetual Inventory** – Opinions expressed in this report at times rely

  upon the accuracy of the Perpetual Inventory recorded in the Nucleus®

Dispensing System. The recordings of the Perpetual Inventory in the Nucleus Dispensing System are a methodological process of continuous recording and tracking of each transaction, additions to or removal of drugs from inventory, allowing anyone with access to see, in real time, the amount of drug on hand for patient dispensing. Each transaction is instantaneously and continuously used to calculate the ending inventory. (A common illustration of perpetual inventory is the maintenance of a bank's check register. Money deposits are added to the account; checks are deducted. At anytime, the balance 'perpetual inventory' is an accurate reflection of available funds in the bank account.)

## II.    BACKGROUND

### A.    <u>Fraud, Waste, and Abuse</u>

"The primary difference between fraud and abuse is intention." See*: CMS 2016 National Training Program – Medicare and Medicaid Fraud and Abuse Prevention.*

The Office of Inspector General (OIG) has identified certain drugs, particularly chemotherapy drugs, as vulnerable to incorrect coding and billing. "We will review Medicare outpatient payments to providers for certain drugs (e.g., chemotherapy drugs) and the administration of the drugs to determine whether Medicare overpaid providers because of incorrect coding or overbilling of units. Context – Prior OIG reviews have identified certain drugs, particularly chemotherapy drugs, as vulnerable to incorrect coding. Providers must bill accurately and completely for services provided. (*CMS Claims Processing Manual, Pub. No. 100-04, Ch. 1, §§ 70.2.3.1 and 80.3.2.2.*)"  See: *U.S. Department of Health and Human Services, OIG, Work Plan for Fiscal Year 2014.*

CMS standard 42 CFR §482.25(b)(3) states: "Outdated, mislabeled, or otherwise unusable drugs and biologicals must not be available for patient use." To avoid the use of outdated, mislabeled, or otherwise unusable drugs, CMS requires all healthcare providers to follow the manufacturers' directions regarding storage, stability, and beyond use dating in the official FDA approved prescribing information (commonly known as the package insert).

"When a physician, hospital, or other provider must discard the remainder of a single use vial or other single use package after administering a dose/quantity of the drug

or biological to a Medicare patient, the program provides payment for the amount of drug or biological discarded as well as the dose administered, up to the amount of the drug or biological as indicated on the vial or package label." See *Medicare Claims Processing Manual, Chapter 17 – Drugs and Biologicals.* In my opinion, the data reflects continuous disregard by the defendants for compliance with significant applicable billing and coding instructions fundamental to the allegations contained in the complaint.

B. **Single-Dose/Single-Use Vials**

- "Use a single-dose/single-use vial for a single patient during the course of a single procedure. Discard the vial after this single use; used vials should never be returned to stock on clinical units, drug carts, anesthesia carts, etc." Further, "Medications in single-dose/single-use vials lack antimicrobial preservatives and are therefore at greater risk to become contaminated and serve as a source of infection when used inappropriately."

- "Do not combine or pool leftover contents of single-dose/single-use vials. Do not store used single-dose/single-use vials for later use, no matter what the size of the vial." See: *Sentinel Event Alert – The Joint Commission June 16, 2014*

- "If a single-dose or single-use vial has been opened or accessed (e.g., needle-punctured) the vial should be discarded according to the time the manufacturer specifies for the opened vial or at the end of the

case/procedure for which it is being used, whichever comes first. It should not be stored for future use."

- "A large single-dose/single-use vial may appear to contain adequate drug to treat more than one patient. However, single-dose/single-use vials typically lack antimicrobial preservative and can become contaminated and serve as a source of infection when they are used inappropriately. Therefore, they should only be used for a single patient and a single procedure."

- "CDC injection safety guidelines have been part of Standard Precautions since 2007."

- "CDC continues to see outbreaks in healthcare settings where providers thought they were preparing and administering injections safely. In the last 5 years alone (2007-2012), CDC is aware of at least 26 outbreaks due to unsafe injection practices. 73% (n=19) of these outbreaks involved use of single-dose/single-use medications for more than one patient. Moreover, infection surveillance is lacking in most outpatient settings; thus it is likely that outbreaks are occurring at a higher frequency, but going undetected."

- "Any potential savings from stretching the contents of single-dose/single-use vials by healthcare providers can be quickly offset by the costs associated with viral hepatitis, bloodstream infections, meningitis, epidural abscesses and other infectious complications. These costs are primarily borne by patients and their families. In addition, clinicians could face legal costs and potentially lose their medical licenses if basic safe practices are not followed and patients are harmed." See: *CDC's Position – Protect Patients Against Preventable Harm from Improper Use of Single-dose/Single-use Vials.*

### III.   MY OPINIONS REGARDING PRACTICES REFLECTED IN MATERIALS I REVIEWED

As I discuss in detail below, the practices reflected in the materials I reviewed indicate Sand Lake Cancer Center engaged in utilization and billing practices contrary to Federal regulations. I will exam and discuss examples found in these materials reviewed of inconsistencies in expected perpetual inventory documentation, which lead to further investigation of specific, clearly defined and documented illustrations of Relator's allegations.

Based on my review of the records and testimony, I observed and conclude that Sand Lake Cancer Center committed billing fraud and abuse by several different methods.

1) Sand Lake Cancer Center committed billing fraud by adding drugs to its perpetual inventory that it did not obtain through proper channels, and subsequently administered and billed for these drugs as a regular billing practice

2) This was accomplished by several different methods:

   a) Retaining residual drug identified in the Defendant's documents as wasted at dispensing with the intent of injecting the residual into subsequent patients

   b) Manipulating the Nucleus® Inventory Management System through various schemes to accumulate residual drug inventory, documented as waste or purported to be rounded down, that is unsupported by purchase invoices or other confirming information as to the origin of the drug through a 'normal distribution channel.' Drug accumulated in this manner was later re-billed to government and other insurance payers.

14

c) Waste/residual drug from previous patient IV mixes were intermixed with additional waste/residual or unopened vials for subsequent IV preparations given to another patient, outside of FDA recognized stability periods and with conspicuous disregard for CDC and other standards recognized for aseptic techniques and safe injection practices.

d) There are consistent examples of inventory increases unsupported by purchases that correspond to waste reported within the same or approximate day. The timing of these transactions supports an inference of fraud and/or abuse.

e) There are abundant examples of inventory transactions of additions to the perpetual inventory not corroborated by evidence in available purchase invoices. In my experience, inventory unsupported by purchase is a key audit trigger. The Defendants allegedly profited by administering drug inventory that was not confirmed as purchased according to the sole source provider for the Nucleus®, which was Oncology Supply during the review period.

3) Practices identified in specific examples appear in similar patterns with various drugs throughout the reliable data reviewed, raising red flags for additional scrutiny.

4) The Relator alleged that the Single Use Vials of drugs were routinely double billed to the government by rounding up the amounts used of such drugs when calculating billing units, all the while intending to use the residual amounts in future IV mixes. For illustration, if a 100mg single use vial was split between two patients, each receiving 50mg, then the government was billed for 100mg of drug

for the first patient and 100mg of drug for the second patient. In other words, both 50mg doses were billed as 100mg. The government was billed for a total of 200mg of drug when only a 100mg single use vial was used.

5)      The Defendants billed the wasted amount up to the allowed guideline, but Sand Lake Cancer Center then used the residual amount on other patients. For example, if 460mg of a 500mg single use vial of a drug was used on one patient, the remaining 40mg was billed as "wasted," but it would actually be used on a second patient and then billed on that second patient's claim on the same or subsequent days. Thus, from a 500mg single use vial of drug, 540mg would ultimately be billed to the government or other payer over the course of treating two patients.

### A.  Methodology

Below I explain specific examples that deviate from expected patterns discerned in the perpetual inventory of available drugs in the Nucleus inventory management system.

I opine on specific instances of inventory manipulation alleged in the complaint and testimonies, based upon the perpetual inventory reflecting accurately the addition and/or the removal of drug in the routine daily operation of infusion services at Sand Lake Cancer Center.

## B.  Limitations on Expert Analysis

According to the Nucleus® data, the first entry in the Nucleus® occurred on 3/27/09.  The inventory system was used inconsistently until full implementation of the Nucleus® features on 1/31/2011.

From 1/31/11, the Nucleus® perpetual inventory was maintained as expected on all drugs and allowed my detailed investigation of the accounting of additions and/or removals of drugs from perpetual inventory. Confidence in the reliability of data continued until 1/23/12, at which time the data reflects a second Nucleus was put into service at a Sand Lake Cancer Center satellite office (St. Cloud).

After 1/23/12, the transaction information that would be necessary for accurate verification from the two separate Nucleus systems is commingled in the data provided by the Defendant for review, which reduces the reliability of the perpetual inventory system. For instance, testimony by Relator (see transcript deposition *Meria Broadnax (December 9, 2017) pages 265, 270, and 276*) indicates drugs were opened at the Sand Lake Cancer Center- St. Cloud office's Nucleus and unused portions were returned to Sand Lake Cancer Center – Orlando office's Nucleus for future IV mixes. Transaction information documenting movement of drug between the separate Nucleus® systems' perpetual inventories is unavailable.

Without an accurate perpetual inventory, there is no way to reliably confirm instances of suspected inventory manipulation compared to the reliable data period 1/31/11 to 1/23/12, as noted above.  There are examples outside of this time span in which I observed similar inventory transactions and manipulations.  I am able to opine that this pattern of similar inventory transactions and manipulations detailed in

subsequent sections of this report are unsupported by data provided by the Defendant's records of inventory purchased through legitimate distributions channels. I can discern on a macro level that similar transactions occurred over the entire five years of data but because of limitations noted above I am unable to do a line by line accounting of individual transactions on the documented dates of service.

To maintain logical corresponding data points between multiple files, the date of service was chosen as the data identifier. This is a reliable identifier because claims are considered to have incurred on the date the beneficiary received the service.  All data files reviewed use this date of service on all transactions, which allows reliable cross-referencing of data (e.g. Nucleus, Electronic Medical Records, Oncology Supply purchases, and FCSO Medicare paid claims).  The ability to cross check date of service over multiple data points in multiple files strengthens reliability in conclusions and opinions found in the investigation of the data, and permits identification of individual transactions within each data set for investigation. Patients are referred to by their first and last initial to maintain confidentiality of sensitive patient information.

# Analysis Number 1

**A.**     <u>**Overview and Applicable Framework:**</u> An example of how fraud was being perpetuated is catalogued in the Complaint on Page 10. The drug is Navelbine® (aka vinorelbine), and per the FDA approved prescribing information:[4]

- Is supplied and labeled in single-use 10mg and 50mg vials.
- Is billed by using HCPCS Level II code J9390. Each unit of J9390 represents 10mg of drug.



---

[4] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=6d47c96a-7fdc-48ac-9250-41c5d3ecf8db

## B.   Practices Concerning Navelbine® (aka vinorelbine)

I reviewed RS's Electronic Medical Records (EMR) (*SLCC001844_CONFIDENTIAL.xlsx*) and compared the findings to the Medicare payments (*wr13808_output.xlsx)* to Sand Lake Cancer Center to relate to the Nucleus® records.

The Electronic Medical Record(s) documents administration of Navelbine® (aka vinorelbine) to RS in the above dispensing data:

- 7/16/09          45mg/no waste
- 7/30/09          45mg/no waste
- 8/13/09          45mg/no waste

The corresponding Medicare claims data from First Coast Service Options (FCSO) to RS in the above dispensing data

- 7/16/09          5 units (this represents 50mg of HCPCS code J1750)
- 7/30/09          5 units
- 8/13/09          5 units

## C.   Discussion

| Column | AB | G | K | F | E | P | Q |
|---|---|---|---|---|---|---|---|
| Row | PT NAME | PRODUCT | TRANSDATE | TXTYPE | TOTAL | DISPQTY BEFORE | DISPQTY AFTER |
| 1 | ***Non-Patient Activity*** | Vinorelbine 10mg/ml 1ml SDV (25477) | 7/10/09 10:34 | Restock | 40 mg | 45 mg | 85 mg |
| 2 | RS (Medicare) | Vinorelbine 10mg/ml 1ml SDV (25477) | 7/16/09 10:10 | Dispense | 45 mg | 0 mg | 0 mg |
| 3 | RS (Medicare) | Vinorelbine 10mg/ml 1ml SDV (25477) | 7/30/09 13:59 | Dispense | 45 mg | 0 mg | 0 mg |
| 4 | ***Non-Patient Activity*** | Vinorelbine 10mg/ml 1ml SDV (25477) | 8/6/09 11:39 | Restock | 40 mg | 0 mg | 40 mg |
| 5 | RS (Medicare) | Vinorelbine 10mg/ml 1ml SDV (25477) | 8/13/09 10:15 | Dispense | 45 mg | 0 mg | 0 mg |
| 6 | ***Non-Patient Activity*** | Vinorelbine 50mg 10mg/ml 5ml SDV (2547 | 8/20/09 14:03 | Restock | 200 mg | 0 mg | 200 mg |

Source:  ABC-SAN-013681 (ABC 013675) w SDV-MDV.xlsx

- Row 1 - On 7/10/09, the Nucleus was Restocked with 40mg (4x10mg) of

  Navelbine (aka vinorelbine), a perpetual inventory documented as 85mg.

- Rows 2 & 3 - On 7/16 & 7/30/09, the Nucleus® documents a dispensing on each

  of those days of 45mg, confirmed in the Electronic Medical Record(s) data. On

  each of these days, the FCSO confirms 5 units (equivalent to 50mg) were billed.

- Row 4 - On 8/6/09, the Nucleus documents a Restock of 4x10mg vials from the supplier, Oncology Supply, leaving an ending inventory of 40mg.

- Row 5 - On 8/13/09, the Nucleus documents a Dispense of 45mg for RS (Medicare) and is confirmed in the Electronic Medical Record(s) (45mg/no wasted) and that FCSO paid a claim of 5 units (50mg).

**D.    Opinion**

#1      The total of 90mg given to RS on the days 7/16 & 7/30 was not accurate because the perpetual inventory level was 85mg prior to the Dispenses.

#2      The total of 45mg given to RS on 8/13/09 was not accurate because is not supported by the perpetual inventory level was 40mg immediately prior to the Dispense

Based on the data and my interpretation, my opinion is that the data and discussion above support the allegations in exhibits reviewed that (A) cancer patients were being deliberately shorted medication administered to them by employees of Sand Lake Cancer Center and (B) patients and government sponsored insurance programs including Medicare and Medicaid, were billed for medications that patients did not receive.

Perpetual inventory review demonstrates an appearance of similar patterns throughout the study period 1/31/2011 to 1/23/2012, especially for drugs which have a high proportion of waste per vial size. Employees in their testimony admitted the Defendant prescribed "rounded down" doses of drugs as a means of

saving money. Cross-referencing dates of service across available files evidences that the Defendant's practices resulted in over billing of Medicare and other payers.

E.     **Financial Analysis**

Vinorelbine 10mg Single Use Vial – J9390     (10mg/unit)

According to the Nucleus dispensing data, the perpetual inventory demonstrates that available drug on hand was not sufficient to compound the requested IV.

For pt. RS – Medicare:
- 4/16/09                 50mg dispensed; only 40mg in perpetual inventory
- 7/16&7/30 /09      90mg dispensed; only 85mg on hand
- 8/13/09                 45mg dispensed; only 40mg on hand

Despite having insufficient on hand inventory to mix 45mg IVs for pt. RS, the Medicare claims file shows an amount equal to 50mg as billed and paid (5 units instead of 4 units that perpetual inventory on hand reflects is on hand. The Nucleus data shows four claims billed for more drug than was on hand. I estimate for the sole Medicare member on Vinorelbine in the Nucleus data, four IVs were fraudulently billed at an average allowed amount of  $65.13 per claim for a total of $260.52.

# Analysis Number 2

A.     **Overview and Applicable Framework:**  Medicare member SH was brought to my attention as a patient who may have been a victim of fraud and abuse. The Defendant was alleged to have used three 400mg single use vials and two 100mg single use vials (total 1400mg) for a prescribed dose of 1440mg. I

found the specific patient encounter on 11/18/13 9:24 for SH for the drug

Avastin® (aka bevacizumab), and per the FDA approved prescribing

information:[5]

- Is supplied and labeled in single-dose 100mg and 400mg single use vials with specific instructions to "Discard any unused portion left in a vial, as the product contains no preservatives."
- Is billed by using HCPCS Level II code J9035. Each unit of J9035 represents 10mg of drug.



---

[5] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=939b5d1f-9fb2-4499-80ef-0607aa6b114e

**B.      Practices Concerning Avastin® (aka bevacizumab)**

I reviewed HS's Electronic Medical Record(s) *SLCC001844_CONFIDENTIAL.xlsx,* Medicare paid claims *wr13808 output.xlsx*, and the Oncology Supply purchases data *ABC-SAN-000282 (ABC 000277) w SDV-MDV.xlsx* to relate to the observations in the Nucleus records.

The Electronic Medical Record(s) documents administration of Avastin (aka bevacizumab) for HS:

- 11/18/13      1440mg/60mg waste

The Medicare claims data from FCSO to HS in the above dispensing data:

- 11/18/13      150 units (one hundred fifty 10mg units of HCPCS code J9035) Equivalent to 1500mg.

The Oncology Supply purchases for Avastin 100mg vials surrounding the dispensing dates:

- 11/15/13      3 vials of 100mg
- 11/21/13      1 vial of 100mg

## C. **Discussion**

| Column | AB | G | K | F | E | P | Q |
|---|---|---|---|---|---|---|---|
| Row | PT NAME | PRODUCT | TRANSDATE | TXTYPE | TOTAL | DISPQTY BEFORE | DISPQTY AFTER |
| 1 | HS (MEDICARE) | Avastin 100mg 25mg/ml 4ml SDV (2458 | 11/18/13 9:24 | WasteAtDispense | 300 mg | 1,000 mg | 700 mg |
| 2 | ES-NMC | Avastin 100mg 25mg/ml 4ml SDV (2458 | 11/18/13 9:57 | WasteAtDispense | 300 mg | 700 mg | 400 mg |
| 3 | ***Non-Patient Activity*** | Avastin 100mg 25mg/ml 4ml SDV (2458 | 11/18/13 11:06 | Restock | 300 mg | 400 mg | 700 mg |
| 4 | ES-NMC | Avastin 100mg 25mg/ml 4ml SDV (2458 | 11/18/13 11:40 | Return | -300 mg | 700 mg | 1,000 mg |
| 5 | ***Non-Patient Activity*** | Avastin 100mg 25mg/ml 4ml SDV (2458 | 11/19/13 13:25 | Audit | 100 mg | 1,000 mg | 1,100 mg |
| 6 | ES-NMC | Avastin 100mg 25mg/ml 4ml SDV (2458 | 11/20/13 9:11 | WasteAtDispense | 300 mg | 1,100 mg | 800 mg |

- Row 1 - On 11/18/13, the Nucleus® was accessed to remove 300mg (3x100mg) of Avastin to be combined with 1200mg (3x400mg) Avastin vials. Avastin 400mg is not included in this discussion as the investigation was focused on 100mg vials. I did confirm that 1200mg was appropriately accessed. The total dose for Medicare member HS, as documented in the Electronic Medical Record(s), was 1440mg with 60mg waste. The ending perpetual inventory is 700mg.

- Rows 2 & 4 - On 11/18/13, the Nucleus data documents a Dispense and Return of 300mg (3x100mg) of Avastin for non-Medicare patient ES.

- Row 3 - On 11/18/13, the Nucleus data documents a Restock of 300mg from Oncology Supply, which is verified as being delivered 11/15/13. The data reflects an ending of perpetual inventory of 1,000mg of Avastin on 11/18/13, as expected.

- Row 5 - On 11/19/13, the Nucleus data documents an addition of inventory during Audit of 100mg. **This additional 100mg is not supported by purchase from Oncology Supply.** The data reflects an adjusted ending perpetual inventory of 1,110mg.

- Row 6 - On 11/20/13, the perpetual inventory was reduced from 1,100mg to 800mg due to the dispensingof 300mg to non-Medicare patient ES.

D.  **Opinion**

The documentation reviewed indicates that the addition of 100mg of Avastin on Audit on 11/19/13, which changed the perpetual inventory from 1,000mg to 1,100mg, is not supported by a purchase from Oncology Supply. Based on the data and my interpretation, my opinion is that this additional 100mg supports the allegation that although the Medicare member HS was prescribed, recorded, and Medicare was billed as receiving a dose of 1440mg plus 60mg of waste, that perpetual inventory records contradict the Electronic Medical Record(s) and FCSO data that a total of 1500mg was dispensed with waste. Instead, the undocumented source of the extra 100mg during Audit supports the allegation that only two vials of 100mg were used when the correct inventory used would have been three vials of 100mg.

Based on the data and my interpretation, my opinion is that the data and discussion above support the allegations in exhibits reviewed that (A) cancer patients were being deliberately shorted medication administered to them by employees of Sand Lake CC and (B) patients and government sponsored insurance programs including Medicare and Medicaid, were billed for medications that patients did not receive.

E.  **Financial Analysis**

Avastin 100mg Single Use Vial – J9035 (10mg = 1 unit)

Due to the unreliability of perpetual inventory maintenance as discussed earlier, a time period of 1/31/11 to 1/23/12 was selected for review.

The Nucleus data shows that during the time period 1/31/11 to 1/23/12, a total of 185 vials of 100mg were Dispensed, WastedAtDispense, Audit, or Returned to inventory (all terms used to denote reductions in perpetual inventory).

The Oncology Supply data shows that during the time period 1/31/11 to 1/23/12, a total of 136 vials were purchased. Additions to the perpetual inventory are denoted by Restock and Audit.

There is a net difference of 49 vials of Avastin 100mg that the Nucleus® records as inventory reduction compared to purchase records. Purchase records do not account for 49 vials for the time period 2/3/11 to 1/3/12. The drug quantity paid for by Medicare and other payers for the drugs reviewed exceeded the quantity available to dispense

For 2011, the four quarterly ASP files released by CMS show an average of $64.09 per 10mg (ASP + 6%). Therefore, Medicare reimburses one vial of Avastin 100mg at approximately $640.90.

In my opinion, 49 vials are unaccounted for at $640.90 per vial for 2/3/11 to 1/3/12. Projected to the entire period 1/09 – 12/13, I estimate a total of 267 vials could exceed inventory dispensed.

# Analysis Number 3

**A.  Overview and Applicable Framework:** I was asked to investigate the allegation of fraudulent or abusive billing practices specific to the drug, Cyclophosphamide 500mg Single Dose Vials., for inventory additions unsupported by purchases from Oncology Supply. Per the FDA approved prescribing information for Cyclophosphamide:[6]

- Is supplied and labeled in single-dose vials containing 500mg, 1gm, & 2gm
- Is billed by using HCPCS Level II code J9070. Each unit of J9070 represents 100mg of drug.



---

[6] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=97ab446f-5017-4180-ae65-0a355289b0ed

**B.** **Practices Concerning Cyclophosphamide**

I reviewed the Electronic Medical Record(s) *SLCC001844_CONFIDENTIAL.xlsx*

and compared the findings to the Medicare payments *SLCC001844_CONFIDENTIAL.xlsx*

and the Oncology Supply purchases *ABC-SAN-000282 (ABC 000277) w SDV-MDV.xlsx*.

Cyclophosphamide 1000mg singe dose vials are used with the 100mg vials discussed to

complete the doses greater than 1000mg. That additional source of drug (1000mg vials) is

not included in the details in this section.

The Electronic Medical Record(s) documents administration of Cyclophosphamide in the
above dispensing data:

- Row 1 BA Medicare – 1020mg given / 480mg wasted
- Row 6 BA Medicare – 1020mg given / 480mg wasted

The corresponding Medicare paid claims data from FCSO in the above dispensing data:

- Row 1 BA Medicare – 15 units paid (represents 1500mg – 1020mg with 480mg
  waste)
- Row 6 BA Medicare – 15 units paid (represents 1500mg – 1020mg with 480mg
  waste)

The Oncology Supply purchases for the proximate period analyzed for
Cyclophosphamide 500mg SDV:

- 7/13/11 – 2 vials
- 8/18/11 – 1 vial
- 8/22/11 – 2 vials

## C. **Discussion**

| ROW | PT NAME | PRODUCT | TRANSDATE | TXTYPE | TOTAL | DISPQTY BEFORE | DISPQTY AFTER |
|---|---|---|---|---|---|---|---|
| 1 | BA Medicare | Cyclophosphamide 500mg Powder SDV ( | 7/20/11 8:23 | WasteAtDispense | 500 mg | 3,000 mg | 2,980 mg |
| 2 | MS-NMC | Cyclophosphamide 500mg Powder SDV ( | 7/20/11 8:30 | WasteAtDispense | 500 mg | 2,500 mg | 2,375 mg |
| 3 | ***Non-Patient Activity*** | Cyclophosphamide 500mg Powder SDV ( | 8/2/11 14:42 | Audit | 1,000 mg | 2,000 mg | 3,000 mg |
| 4 | RA-NMC | Cyclophosphamide 500mg Powder SDV ( | 8/10/11 8:56 | WasteAtDispense | 500 mg | 3,000 mg | 2,672 mg |
| 5 | MS-NMC | Cyclophosphamide 500mg Powder SDV ( | 8/10/11 9:05 | WasteAtDispense | 500 mg | 2,500 mg | 2,375 mg |
| 6 | BA Medicare | Cyclophosphamide 500mg Powder SDV ( | 8/10/11 9:28 | WasteAtDispense | 500 mg | 2,000 mg | 1,980 mg |
| 7 | ***Non-Patient Activity*** | Cyclophosphamide 500mg Powder SDV ( | 8/19/11 11:31 | Restock | 500 mg | 1,500 mg | 2,000 mg |
| 8 | AF-NMC | Cyclophosphamide 500mg Powder SDV ( | 8/22/11 13:20 | WasteAtDispense | 500 mg | 2,000 mg | 1,734 mg |
| 9 | ***Non-Patient Activity*** | Cyclophosphamide 500mg Powder SDV ( | 8/23/11 15:11 | Audit | 1,500 mg | 1,500 mg | 3,000 mg |
| 10 | RA-NMC | Cyclophosphamide 500mg Powder SDV ( | 8/31/11 9:19 | WasteAtDispense | 500 mg | 3,000 mg | 2,672 mg |

Source: ABC-SAN-013681 (ABC 013675) w SDV-MDV.xlsx

- Row 1 – On 7/20/11, the Nucleus® reflects an IV of 1020mg was mixed by combining one vial of Cyclophosphamide 1000mg along with one vial of Cyclophosphamide 500mg for BA (Medicare) with 480mg waste.

- Row 2 – On 7/20/11, an IV was mixed for MS (non-Medicare). The Nucleus® documents 375mg of waste

- Row 3 – On 8/2/11, an addition of two 500mg single use vials of cyclophosphamide was added into the Nucleus® system after the physical count. However, available supplier data detailed above does not reflect the purchase of these 2 vials on or about 8/2/11.

- Row 6 – On 8/10/11, the Nucleus reflects an IV of 1020mg was mixed by combining one vial of Cyclophosphamide 1000mg along with one vial of Cyclophosphamide 500mg for BA (Medicare) with 480mg waste.

- Row 7 – On 8/19/11, one 500mg vial of Cyclophosphamide was added into the Nucleus system under Restock, which is supported by the Oncology Supply data. Normal restocking.

- Row 8 – On 8/22/11, the Nucleus® perpetual inventory reflects an IV was mixed for AF (non-Medicare). The Nucleus® documents 234mg of waste.

- Row 9 – On 8/23/11, an addition of three 500mg vials of Cyclophosphamide was added into the Nucleus system under Audit. The Oncology Supply data does not entirely reflect this inventory addition. Two vials were obtained from Oncology Supply on 8/22/11, not three. The third vial added to inventory is not supported by a purchase.

**D.** **Opinion**

- #1 – Inventory additions on 8/2/11 (2 vials) & 8/23/11 (1 vial) are not supported by purchases by Sand Lake CC.

- #2 – According to testimony, doses were routinely rounded down when possible to save money, not only for the practice but also for Medicare or other insurance payers. See – *Deposition transcripts of Dr. Vincinio Hernandez (March 9, 2017) & Valerie Bastani (January 22, 2018)* It is my opinion that, even though Medicare and non-Medicare patients can not be separated during perpetual inventory analysis, that there is substantial evidence to say that rounding down resulted in an extra vial being subsequently entered back into inventory several times in this brief period. The Medicare paid claims for BA indicate that rounding down did not result in reduced claim amounts billed to Medicare. It is my opinion that a vial(s) documented in Nucleus as dispensed and wasted by BA contributed to the non-purchased inventory increases noted above. Aforementioned testimony regarding rounding down supports the opinion that although the Electronic Medical Record(s) states that 1020mg was given and 480mg was wasted, it is reasonable to propose with certainty that 1000mg was given and 500mg was not mixed to obtain the necessary 20mg for the total 1020mg dose, and instead

contributed to the observed inventory additions that are not supported by purchase invoices by Sand Lake Cancer Center.

Additional investigation demonstrates that, in 2011, 43 vials of Cyclophosphamide were purchased from Oncology Supply while 54 vials were added to inventory via Restock &/or Audit. In 2012, 75 vials were bought from Oncology Supply while 134 vials were added to inventory via Restock &/or Audit. Further investigation on the impact of the scheme on Medicare and other insurers as detailed above is warranted as a cursory review of reliable perpetual inventory data reveals a similar pattern of inventory additions that has the appearance of repeated manipulations unsupported by purchases.

Based on the data and my interpretation, my opinion is that the data and discussion above supports the allegations in exhibits reviewed that (A) cancer patients were being deliberately shorted medication administered to them by employees of Sand Lake CC and (B) patients and government sponsored insurance programs including Medicare and Medicaid, were billed for medications that patients did not receive.

E.    **Financial Analysis**

Cyclophosphamide 500mg Single Use Vial – J9070 (100mg/billing unit)

According to Nucleus data, a total of 216,360 mg of Cyclophosphamide from 500mg vials was Dispensed, DispensedAtWaste, and Returned during the 1/09 to 12/13 time period, which was billed to Medicare and other payers. There was found in the Nucleus data a total of 467 rows of Cyclophosphamide from 500mg vials.

According to Nucleus data reviewed, there was a total of 190,481mg added back into inventory by Restock or Audit.  Simple division provides that 190,481 divided by 500mg (per vial) equals 381 vials. Further analysis of the Nucleus data shows that Restock from Oncology Supply equals 261 vials which is validated in the supplier data which shows a total of 260 vials were purchased from 1/09 to 12/13.

According to Nucleus data reviewed, there was a total of 59,981mg of Cyclophosphamide added back into the perpetual inventory during Audit (as defined, a physical count). Simple division provides that 59,981 divided by 500mg (per vial) equals 120 vials unsupported by purchasing invoices. This is further confirmed by the fact that 120 vials from Audit plus 261 vials from Restock equals 381 vials, which concurs with available Nucleus® inventory dispensed data.

 The documents I have reviewed indicate that the Defendants billed for more drug than was purchased and is considered a red flag for fraudulent and/or abusive billing practices. It is my opinion that the data indicates that the Defendants accumulated waste enough to add 120 vials into inventory unsupported by purchase during the time period 1/09 to 12/13.

For the period 1/09 to 12/13, the CMS payment limits fluctuated substantially, from $4.34 per 100mg unit in the first quarter of 2009 to $39.67 per 100mg unit in the fourth quarter of 2013. Utilizing the CMS quarterly payment limits for the study period, the average per unit for the study period was $22.83 per 100mg unit, which equates to $114.15 per 500mg vial. Based upon the conclusion above that 121 vials are not substantiated by purchase records, I conservatively estimate that $13, 812 of Cyclophosphamide for 120 vials of 500mg were fraudulently billed in that purported

33

waste appears throughout the data period to be returned to inventory without the explanation that it was purchased by the Defendant. Based upon a 31% Medicare patient population by the Defendant, I calculate $4281.77 is directly attributable to Medicare fraudulent and/or abusive billing.

# Analysis Number 4

**A.**    **Overview and Applicable Framework:**  I was asked to review the Relator's

testimony (see *deposition of Meria Broadnax (December 9, 2017 pgs. 294 and 295*)

regarding the routine use of expired and/or adulterated Flurouracil (aka 5FU) to mix IV

infusions, which appears on reading a conscious disregard of the FDA beyond-use

warnings included on the package insert that accompanies every vial of drug by FDA

guideline.

> "*BY MR. GREENE:*
>
> *Q.*    *Thank you. Exhibit 62, what does that represent?*
>
> *A.*    *I believe this is five FU that was brought from St. Cloud, and it was a big deal because it had a lot of particles in it.  And the date that was on it, I mean, it's a single-dose, so we shouldn't have been using it anyways. But the beyond-use date was maybe a month or so.*
>
> *MR. GREENE: Let's go off the record, please. Let's stop.*"

Flurouracil (aka 5FU) per the FDA approved prescribing information:[7]

- Is supplied and labeled in single-dose vials in multiple packages
    - 500mg Single-Dose Vial
    - 1000mg Single-Dose Vial
    - 2500mg Pharmacy Bulk Package w/o preservative
    - 5000mg Pharmacy Bulk Package w/o preservative
- Has specific FDA approved guidelines for preparation and storage for IV mixing utilizing Pharmacy Bulk Packages (see below)
- Is billed by using HCPCS Level II code J9190. Each unit of J9190 represents 500mg of drug billed.

---

[7] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=b4328ae3-f48f-40b1-9719-1c1aced7c734



**Fluorouracil**
Injection, USP

PHARMACY BULK PACKAGE—
Not for Direct Infusion

2.5 gram per 50 mL

(50 mg per

FOR INTRAVENOUS
USE ONLY

50 mL

Rx only

- PREMIERProRx®

**B.**     **Practices Concerning Flurouracil –**

    See separate discussions below.

**C.**     **Discussion**

| ROW | PT NAME | PRODUCT | TRANSDATE | TXTYPE | TOTAL | DISPQTY BEFORE | DISPQTY AFTER |
|---|---|---|---|---|---|---|---|
| 1 | FM Medicare | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/17/11 8:56 | Dispense | 764 mg | 87,002 mg | 86,238 mg |
| 2 | FM Medicare | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/17/11 8:56 | Dispense | 1,146 mg | 86,238 mg | 85,092 mg |
| 3 | JL Medicare | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/17/11 9:00 | Dispense | 692 mg | 85,092 mg | 84,400 mg |
| 4 | JL Medicare | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/17/11 9:01 | Dispense | 1,038 mg | 84,400 mg | 83,362 mg |
| 5 | EP NMC | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/21/11 8:57 | Dispense | 978 mg | 83,362 mg | 82,384 mg |
| 6 | EP NMC | 5FU 2.5gm 50mg/ml 50ml PBP (18716) | 11/21/11 8:57 | Dispense | 652 mg | 40,000 mg | 39,348 mg |
| 7 | DB NMC | 5FU 2.5gm 50mg/ml 50ml PBP (18716) | 11/21/11 9:06 | Dispense | 988 mg | 39,348 mg | 38,360 mg |
| 8 | DB NMC | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/21/11 9:06 | Dispense | 1,482 mg | 82,384 mg | 80,902 mg |
| 9 | JS Medicare | 5FU 2.5gm 50mg/ml 50ml PBP (18716) | 11/21/11 9:08 | Dispense | 890 mg | 38,360 mg | 37,470 mg |
| 10 | DB NMC | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/22/11 8:48 | Dispense | 988 mg | 80,902 mg | 79,914 mg |
| 11 | DB NMC | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/22/11 8:50 | Dispense | 1,482 mg | 79,914 mg | 78,432 mg |
| 12 | EP NMC | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/22/11 8:52 | Dispense | 652 mg | 78,432 mg | 77,780 mg |
| 13 | EP NMC | 5FU 5gm 50mg/ml 100ml PBP (10745) | 11/22/11 8:53 | Dispense | 978 mg | 77,780 mg | 76,802 mg |

- On Rows 1-12, there is clear evidence within the perpetual inventory (column: DISPQTY AFTER) that vials of Flurouracil were used as Multidose Vials as demonstrated by the running count divisible to the 'mg'. The data does not provide reliable evidence to draw conclusions about individual Medicare members billing. It is impossible to tell when a new vial was opened, which if handled properly, would be discarded after four hours (hence leaving an inventory divisible by the package size).

- According to the testimony of V. Bastani (see testimony *(Valerie Bastani (January 22, 2018 pg. 174))*, when asked if she ever ordered Fluorouracil (5-FU) in pharmacy bulk packaging, V. Bastani's reply was "I'm not sure what you mean by bulk packaging. I'm not familiar with that term."

- According to the testimony of V. Bastani (see testimony *(Valerie Bastani (January 22, 2018 pg. 48 ))*, Q: "Okay. Did you ever, when you started at Sand

Lake Cancer Center, have any questions about how to administer any chemotherapy drugs?" A: "Yes" Q: "When you had those questions, did you seek out the packet *[sic]* insert or advice from the sales rep?" A: "Yes."

- According to the labeling requirements for prescription drugs (see *21CFR201.57)*, under the Dosage and Administration section of the Package Insert that accompanies each vial of prescription drug, the following guidelines are mandated by the FDA: "This section must also contain specific direction on dilution, preparation," "storage conditions for stability of the reconstituted drug, when important," and "the following verbatim statement for parenterals: 'Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit'."

- According to the package insert instructions[8] included in the Flurouracil (5FU) utilized by Sand Lake Cancer Center: *"Fluorouracil is supplied in a pharmacy bulk package consisting of a vial. The pharmacy bulk package can be used to prepare doses for more than one patient. It is not supplied with a sterile transfer device, which is required for dispensing when multiple doses will be prepared from the single vial. The vial is only intended for preparation in a Pharmacy Admixture Service under appropriate conditions for cytotoxic drugs. Store vial at room temperature. Using aseptic conditions,* **penetrate the container closure once with a suitable sterile transfer device or dispensing set** *that allows measured distribution of the contents.* **Record the date and time the vial was**

---

[8] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=21af1777-87f7-4e40-9917-f1677e7ff1a5

***opened on the vial label***. ***Discard the pharmacy bulk package 4 hours after***

***penetration of the container closure***." (W. Parker added emphasis)

- In my experience managing and personally mixing in high volume IV operations, the package insert is regularly consulted for manufacturer's beyond use dating of reconstituted or mixed medications to ensure medications are not used past the beyond use date. Use of medications outside of beyond use instructions is contrary to the safe medication practices, CDC guidelines, and is a cornerstone of aseptic technique.

- According to purchase statistics compiled from the Oncology Supply supplier data, during the study period (1/2009 – 12/2013), Fluorouracil was purchased by Sand Lake CC only in single-dose vials of 2.5gm/50mg and 5gm/100ml of Pharmacy Bulk Packages.

  - o FLUOROURACIL 2.5GM PBP 50ML VL        26 vials
  - o FLUOROURACIL 2.5GM/50ML PBP           80 vials
  - o FLUOROURACIL 5GM/100ML PBP            42 vials

- According to Nucleus® dispensing records, over the study period of 1/2009 thru 12/2013, there were 907 unique days in which a patient received Fluorouracil. In my opinion, I would expect to see purchase data approximating 907 vials, instead of 148 vial, if Defendants had used proper aseptic technique and followed FDA approved guidelines for beyond use dating.

- According to Nucleus dispensing records, over the study period of 1/2009 thru 12/2013, there were only 14 entries for the Nucleus 'Action' term WasteAtDispense. Further indicating the dearth of inventory actually disposed of with waste, which was used subsequently on other patients.

**D.**     <u>Opinion</u>

(1)    A comprehensive look at dispensing data for Fluorouracil Pharmacy Bulk Packages, intended for single use, forms my opinion that despite adequate warnings, and FDA and manufacturer's guidance, Sand Lake Cancer Center made it the practice's policy to disregard the beyond use dating of 4 hours. Sand Lake Cancer Center chose to use Pharmacy Bulk Bottles exclusively, even though the Single Use vials noted above (500mg & 1000mg) were commercially available. Instead, Fluorouracil Pharmacy Bulk Packages were routinely exposed to non-aseptic conditions, which in my opinion potentiated the possibility of the spread of opportunistic infections throughout the patient population of Sand Lake Cancer Center, especially patients receiving intensive immune suppressing chemotherapy regimens.

According to Nucleus dispensing records, Sand Lake Cancer Center mixed and infused patients for a total of 907 unique days. According to Oncology Supply supplier data, a total of only 148 vials were purchased. In my opinion, based upon the foregoing evidence and testimony read, Sand Lake Cancer Center paid no attention to the fact that Fluorouracil contained no preservatives and was to be discarded no later than 4 hours after initial entry into the vial. In my opinion, Sand Lake Cancer Center, through testimony read and data reviewed, demonstrated disregard for CDC advice regarding the use of single-use vials as detailed throughout this report.

The above-mentioned documents indicate to me that, in regard to this particular drug, Defendants improperly instructed employees to disregard guidelines universal to

proper aseptic technique and the need to take all steps available to guard against contaminating IV admixtures and minimizing the potential introduction of infectious agents into patients who, by the inherent nature of oncology treatments, are already immunocompromised.

Based on the data and my interpretation, my opinion is that the data and discussion above supports the allegations in exhibits reviewed that (B) Defendants utilized single-use vials on more than one patient, treating them as multiuse vials.

(2)     Multiuse vials are not subject to payment for discarded amounts of drug or biologicals. See *Medicare Claims Processing Manual, Chapter 17, Section 40 – Discarded Drugs and Biologicals*   *https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c17.pdf*

The daily practice of Sand Lake Cancer Center was to use Flurouracil as a multiuse vial. As noted above, multiuse vials are not subject to payment for discarded amounts of drug or biologicals. However, according to the FCSO Medicare claims file, Sand Lake CC universally billed for waste. Waste that was not recorded as Waste in the Nucleus system, but was however billed to Medicare and other insurance carriers. Waste that was carried in the perpetual inventory despite having already been billed to and paid by Medicare and other insurance carriers was used on subsequent patients.

Referencing the table above as an example, Rows 3&4, Medicare member JL was Dispensed enough 5FU to mix two IVs (1146mg + 692mg = 1838mg). Medicare was billed and paid for 4 units (4 x 500mg = 2000mg). However, the perpetual inventory

records that only 1838mg was removed from inventory. Therefore, an additional 162mg, which was paid for as waste by Medicare per policy, is used on subsequent IV mixes and is billed to Medicare and other payers.

 Based on the data and my interpretation, my opinion is that the data and discussion support the allegations in the exhibits reviewed that (E) Patients and government sponsored insurance programs, including Medicare and Medicaid, were billed for medications that were purportedly wasted, but in reality were used on other patients.

**E.**     **Financial Analysis**

Flurouracil (5FU) Single Use Vials – J9190 (500mg/billing unit)

According to Medicare paid claims data for the period 1/2009 – 12/2013, a total of 502 claims for 5FU were filed with Medicare. Of those 44 claims were denied, leaving a total of 458 claims in which either Medicare paid for drug which had been "wasted" on previous patients or Medicare paid for drug which was "wasted" but was subsequently also paid in the future by Medicare or other payers.

It is my opinion that the practice of saving residual drug to be used on subsequent IV mixes is a departure from both CMS guidance and industry norms. There is no medical or cost saving justification for doing so. In my opinion, saving residual drug and using it on subsequent patients, drug that has no cost basis, was routinely being double billed, once for the waste and once for its reuse, appears to be fraudulent billing.

I estimate that 458 Medicare members were affected by this Sand Lake Cancer Center practice. The Medicare paid claims data shows a total of $2,278.28 paid. Vials of

5FU were routinely double billed to the government by rounding up the amounts used for such drugs when billing them. For illustration, a Medicare patient receives an order for 420mg. The IV is mixed with exactly 420mg and the Defendant would bill Medicare for 500mg (1 unit). The 80mg of residual would remain in inventory for use on the next patient, either Medicare or other payer. As further example, the next patient may receive an IV mixed with exactly 240mg. This IV would be mixed with the 80mg residual, which was previously billed and paid, plus another 160mg, to equal the 240mg dose. The Defendant would bill Medicare for 500mg (1 unit). The 260mg residual would remain in inventory for use on the next patient, either Medicare or other payer. The scenario and scheme repeats continually throughout the Nucleus® data reviewed.

The repetitive nature of the scheme is such that every patient's insurer is billed for waste or residual for the initial IV mix, the subsequent patient's insurer pays not only for the duplicative bill from the residual, but also for waste or residual from the second patient's IV. This scheme appears to perpetuate throughout the Nucleus® data with various drugs not included in my report.

It is my opinion that the use of 5FU single use vials for multiple patients across multiple days, disregarding FDA storage and stability requirements, occurs in virtually all dispenses from 1/2009 to 12/2013. The unreliability in the Nucleus dispensing perpetual inventory in pinpointing specific inventory transactions that appear fraudulent or abusive, as explained above, I choose to approach this analysis based upon the quantity of drug purchased from Oncology Supply. The resultant observation is that from 1/2009 to 12/2013, 1387 vials (equivalent to 2.5gm PBP vials) were affected as indicated in 4050 rows identified as Dispense, WasteAtDispense, or Return. Based upon a per vial

acquisition cost of $8.15 as shown in the Oncology Supply data, I determined that a

conservative estimate of cost of goods was $11,204.05 (1387 x $8.15), with the

Defendant's Medicare patient population (31%) accounting for $3,473.26.

# APPENDIX A

**WILLIAM B. PARKER, BS MS Pharmacy**
**PO Box 47318 Jacksonville, FL 32247**
**(904) 982-5799 bparker.srxanalytics@icloud.com**

Practicing consultant with 40 years of professional experience in utilization of pharmaceuticals, insurance reimbursement, and detection and prevention of fraud, waste and abuse (FWA) in high cost complex therapies through all channels of distribution (manufacturer, wholesaler, and pharmacies including retail, home infusion, hospital, physician office, and high tech specialty pharmacy). Expert in recognizing and investigating unexpected pharmaceutical use patterns and appropriate billing, especially infusible drugs. Expert in tracing secure chain distribution of drugs from manufacturer to patient, accounting for individual steps of channel documentation. Clients include managed care organizations, physician provider practices, hospital systems, pharmaceutical companies, and all licensed pharmacy delivery models (except Nuclear Pharmacy). I am a subject matter expert in HCPCS code transactions involving medications (e.g. Level II "J" codes used to bill Medicare Part B provider administered drugs) in all sites of service (home infusion, physician provider offices, hospital outpatient infusion suites, and free standing infusion suites).

## EDUCATION

BS Pharmacy, Auburn University August 1978
MS Pharmacy, University of Florida August 2016

Pharmaceutical Outcomes and Policy Graduate Studies:

| | |
|---|---|
| Pharmaceutical Fraud & Abuse | Federal Regulation of Drugs & Pharmacy |
| Medicare & Medicaid Regulations & Implications | Federal Regulation of Controlled Substances |
| Structure, Process & Outcomes of Regulation | Health Care & Patient Safety |
| Ethics in Drug Production, Distribution & Use | Patient Responsibility in Health Care |
| Regulating Pharmaceutical Access & Cost/Benefit | Research Seminar – Specialty Pharmacy |

**Consultant/Managing Partner –**                                     **2012 – present**
 (SRx Analytics, LLC**)**

> **February 2013 – December 2014**
> Retained as a consulting analyst to detect fraud, waste and abuse in the payer claims data warehouse, exceeding 65 million claims/year. Prepared data inquiries and cases for investigation by the Special Investigations and Payer Audit Units for Florida Blue (fka BlueCross BlueShield of Florida). Based upon findings, I was able to recommend modification of edits of automated adjudication algorithms to the client to continuously improve the quality of their claim payment system.

**Blue Cross and Blue Shield of FL**, Jacksonville, FL          **2010- 2012**
**Clinical Pharmacist - Care Management**
Responsible for recognizing and creating financial and clinical processes to improve medical and administrative cost management for medical pharmacy claims administered by a 450 person Care Management department which included Pre/Post Service Medical Review, Medical Directors, Concurrent Review, Appeals and Disputes, Care Management, and Rare Condition Case Management.

**Blue Cross and Blue Shield of FL**, Jacksonville, FL          **2008- 2010**
**Manager, Specialty Pharmacy Operations**
Responsible for leading a team of Senior Managers, Clinical Pharmacists, and Healthcare Data Consultants in the global clinical and financial administration of specialty pharmaceuticals and medical injectables in a large managed care organization (2+ million lives) Lead strategist and project champion of establishment of an Alternate Site of Care initiative recognized nationally as an innovation in the delivery of cost efficient infusion therapy for high cost complex drug therapies, including biologics and oncologics.

**Ambient Specialty Infusion**, Jacksonville, FL          **2007-2008**
**Business Development Consultant**
Responsible for innovating and driving alternate site infusion business with a focus on hospital case managers, infectious disease specialists, hospitalists, and pharmacy directors.

**Medco/Accredo Specialty Pharmacy**, Jacksonville, FL          **2005-2007**
**Pharmacy Operations Manager**
Responsible for global management of pharmacy operations and personnel within a high volume closed door specialty/high tech infusion pharmacy. After hours, worked with training and preparing ancillary staff to study and pass the Certified Pharmacy Technician training program.

**AstraZeneca Pharmaceuticals**, Jacksonville, FL          **2001-2005**

**Sales and Marketing Specialist**

### SunScript Long Term Care Pharmacy, Jacksonville, FL      1999-2001
**Clinical and Consultant Pharmacist**

### Memorial Medical Center, Jacksonville, FL      1989-1999
**Clinical Pharmacist**

### Physician Sales and Service, Jacksonville, FL      1987-1989
**Operations Manager**
Responsible for start-up of an FDA and DEA compliant wholesale drug and controlled substance pharmaceutical distribution operation within a drug and medical supply distributor serving the United States.

### Prudential Health Care Systems, Jacksonville, FL      1984-1987
**Manager, Healthcare Operations**
Responsible for development, administration, and finances of a capitated pharmacy benefit serving members of a network/group model HMO & PPO. Managed drug utilization review and formulary system development for SE operations.

**<u>PRIOR RETENTION AS EXPERT</u>**

UNITED STATES OF AMERICA ex rel. Michael Irwin; State of California ex rel. Michael Irwin v. WALGREEN CO., Case No. 2:13-cv-8473-BRO (ASx)

# Appendix B

| BATES LABEL | DATE | DESCRIPTION | SECTION | |
|---|---|---|---|---|
| N/A | N/A | **Title 42, Ch. IV, Subchapter C; Part 455, §455.2** | **Sec I. C (3)** | |
| N/A | N/A | **Medicare Fraud & Abuse: Prevention, Detection, and Reporting, Medicare Learning Network Sept 2017**<br><br>https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Fraud_and_Abuse.pdf | **Sec I. C (3)** | |
| N/A | N/A | **CMS 2016 National Training Program – Medicare and Medicaid Fraud and Abuse Prevention**<br>https://www.cms.gov/Outreach-and-Education/.../Sept2016Mod10PPTFinal.pptx | **Sec I. C (3)**<br>**Sec III.** | |
| N/A | N/A | **Data Standards Manual Package Type**<br>*https://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071748.htm* | **Sec I. C (3)** | |
| N/A | N/A | **CDC FAQs Regarding Safe Practices for Medical Injections**<br>https://www.cdc.gov/injectionsafety/pdf/faqs-safe-practices-for-medical-injections.pdf | **Sec I. C (3)** | |
| N/A | N/A | **Nucleus® Inventory Management**<br>*www.iononline.com* | **Sec I. C (3)** | |
| N/A | N/A | **CMS.gov HCPCS Level II Coding Process & Criteria**<br>https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/HCPCSCODINGPROCESS.html | **Sec I. C (3)** | |
| N/A | N/A | **Medicare Claims Processing Manual, Chapter 17 – Drugs and Biologicals**<br>https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c17.pdf | **Sec I. C (3)** | |
| N/A | N/A | **Preservatives: Are they safe?**<br>http://www.ema.europa.eu/docs/en_GB/document_library/Presentation/2010/09/WC500096784.pdf | **Sec I. C (3)** | |
| N/A | N/A | **U.S. Department of Health and Human Services, OIG, Work Plan for Fiscal Year 2014.**<br>https://oig.hhs.gov/reports-and-publications/archives/workplan/2014/Work-Plan-2014.pdf | **Sec II. A** | |
| N/A | N/A | **CDC's Position – Protect Patients Against Preventable Harm from Improper Use of Single-dose/Single-use Vials**<br>https://www.cdc.gov/injectionsafety/cdcposition-singleusevial.html | **Sec II. B** | |

| N/A | N/A | **CDC FAQs Regarding Safe Practices for Medical Injections** https://www.cdc.gov/injectionsafety/providers/provider_faqs_multivials.html | **Sec. II. B** | |
|-----|-----|---|---|---|
| N/A | N/A | **Sentinel Event Alert – The Joint Commission June 16, 2014** https://www.jointcommission.org/assets/1/6/SEA_52.pdf | **Sec II. B** | |
| N/A | N/A | **Nucleus® 3.0 Reference Guide** https://webcontent.oscautomation.com/cms/docs/QuickRefGuide.pdf | **Sec II. C** | |
| N/A | N/A | **OncologySupply.com** | **Sec. II C** | |
| N/A | N/A | **Drug Pedigree Requirements for Pharmacies and Wholesalers** *http://www.namsdl.org/library/3B95E55C-1C23-D4F9-74025D5E2B9B3371/* | **Sec III. (2)(B)** | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |